## THEAGO v. ROYAL INDEMNITY CO.
### No. 2519.

Court of Civil Appeals of Texas. Beaumont. April 17, 1934.

Rehearing Denied April 25, 1934.

E. B. Colgin, of Houston, for appellant.

Hunt & Hunt, of Houston, for appellee.

COMBS, Justice.

This is a compensation suit instituted in the district court of Harris county, to set aside an award of the Industrial Accident Board in favor of appellant, Lilly Theago, surviving wife and sole beneficiary of Moses Theago, deceased. The appeal was to the Galveston Court of Civil Appeals, and the case is before us on transfer by the Supreme Court.

At the time of the alleged injury, which occurred December 10, 1930, Moses Theago was employed by the Valley Construction Company, in work upon the Bender Hotel building in Houston and appellee, Royal Indemnity Company, was the compensation insurance carrier.

■ The appeal is from a judgment based on an instructed verdict denying appellant recovery on the ground that the evidence failed to raise an issue that the death of Moses Theago resulted from an injury. Viewing the testimony in the light most favorable to appellant, as we must do in view of the instructed verdict, it establishes the following facts.

■ The deceased was employed by the Valley Construction Company as a hod carrier and helper and had been working for the company in that capacity for about two years. On the morning of December 10, 1930, he came to work about 7:30. His work consisted of pushing a wheelbarrow loaded with plaster mortar from the elevator where it was delivered to the floor on which the crew was working, to the place where the construction work was in progress, a distance of 45 or 50 feet, and returning the empty wheelbarrow to the elevator. The wheelbarrow load of plaster mortar weighed about 175 pounds and required a good deal of strength and exertion to push it. After working very fast for some two hours, deceased and Paul Henderson, a fellow workman, undertook to move a scaffold, this work being in their line of duty, and while lifting on this scaffold Theago suffered a stroke of apoplexy and "fell out," as one witness expressed it. He was carried to his home and died about 3:30 o'clock the following morning.

The events immediately surrounding the "falling out" of Theago were detailed by Paul Henderson, who was working with him at the time, in substance, as follows: The scaffold which Henderson and deceased were attempting to lift consisted of one by twelve planks 14 or 16 feet long placed on top of "sawhorses," or supports made by nailing two legs on each end of a cross piece. These legs were some 4 or 5 feet long. On the planks forming the scaffold were two mortar boxes containing two wheelbarrow loads of mortar each. The scaffold had developed a "sag" which caused one of the "sawhorses" or supports to lean, and the witness and Theago undertook to move it so as to straighten it up. Witness took hold of one end of the "sawhorse" to lift it, and Theago undertook to lift or move the other end. Omitting immaterial portions, the testimony of the witness from this point is as follows:

"Q. Where were you? A. I was on one end of the saw horse and he was on the other.

"Q. Right close together? A. Yes.

"Q. Now, when you pulled state whether or not to you it was any kind of strain in pulling? A. It was a strain to me. I pulled my end over and he was on that end but it didn't seem like he could move his end.

"Q. State whether or not it was heavy? A. Yes, sir.

"Q. Are you a large or small man, so the record will show? A. I would say I am medium sized.

"Q. Could you tell whether he was exercising himself unusually when he was pulling? A. Yes, sir, he was straining.

"Q. Now, when he was straining there what happened? Did he give way? A. Yes, he give way all of a sudden and he called to me to come help him move. He said, 'I can't move.' He was just like he was paralyzed.

"Q. Do you know what happened to him? A. No, sir, I don't know what was the trouble with him. He just give away all at once.

"Q. Do you know whether any part of his body was affected? A. Well, it seemed he was weak across his back. You see he was stooping down pulling and he just give way.

"Q. Now, after he had fallen do you know what part of his body was affected, if any? A. Well, it seemed like his back was affected.

"Q. You don't know what was the matter with him? A. No, sir.

"Q. He just fell? A. Yes, sir.

"Q. After he fell, if anything was done with him, what did they do with him? A. I helped him out from under the scaffold and sat him out about ten feet from where he was and Dave and a couple more of the boys took him out and carried him home. I didn't leave the basement."

After "falling out," as above detailed, Theago complained of his head hurting. He was carried to his home. His entire left side was paralyzed. He died the following morning about 3:30 o'clock.

It was shown that Theago had been a healthy man and a regular worker. When he came to work on the morning in question he appeared to be cheerful and feeling well, and up until the time he "fell out" he had not complained of being ill. He was forty-four years of age. The only medical testimony offered was Dr. Wm. Brumby, a physician of broad experience and high standing in his profession. Dr. Brumby did not examine the deceased and simply testified as an expert, basing his testimony on facts detailed to him as to the circumstances surrounding the "falling out" of the deceased and the symptoms. Dr. Brumby testified that in his opinion deceased died as the result of a stroke of

paralysis produced by the rupture of a blood vessel in his brain; that the fact that the left side was paralyzed indicated that the rupture took place in the motor centers of the right side of the brain. He stated that this was probably produced by the strain of the deceased in trying to move the heavy object; that straining raises the blood pressure. He further said that the natural inference would be that there was some predisposing consideration such as hardening of the arteries. And he testified:

"Q. From the facts that were stated here yesterday, in your opinion, what reasonably and probably happened to that man? A. The first thought is a stroke of paralysis.

"Q. Was or not that a reasonable probability? A. The first thought of any doctor that any man had suddenly become paralyzed, there was some change in his brain that brought about a stroke. * * *

"Q. It is in evidence that this man did not complain, did not have any headaches, his wife testified he never complained of any headaches or dizziness; he always appeared to be a healthy man, didn't lose a day's work; this man was testified to be about forty-four years of age; if he suffered that stroke during the strain as you have testified, have you any opinion as to whether or not, from a reasonable probability, there was anything at all the matter with his arteries? * * * A. Certainly.

"Q. Describe why you say that. A. Regardless of a man's age the older he gets one of the normal changes that occurs in any man as he grows older is hardening of the arteries. The older he gets the more that grows. The older he gets the more chances there is of a stroke; his blood pressure gets higher, he may not have any pain. It is seldom that hemorrhage occurs in the brain before twenty; it is common at forty, and as he grows older of course.

"Q. At forty-four could that reasonably be the cause? A. He is more apt to have had high blood pressure.

"Q. If he had the structural changes would the high blood pressure reasonably result from the hardening of the arteries? A. Certainly. * * *

"Q. State whether or not it is or is not reasonably probable that a man who has those structural changes you have talked about at forty-four would have any degree of high blood pressure. A. It is quite probable yes. The hemorrhage that occurred was due to the fact that the arteries were weakened in

this hardening process. We speak of them being weakened because it is more susceptible to hemorrhage.

"Q. Now when the man undergoes a strain such as we have described, this man underwent when he was pulling, and the rapid work he was doing for practically two hours shoving a wheelbarrow loaded with mortar, what effect does that reasonably and probably have with reference to accelerating the blood pressure against the arteries? * * * A. Muscular strain, manual labor, if the blood pressure was known to be high, it would be prohibited. A doctor would advise against it, regardless of the fact he had had no pain or symptoms, except the blood pressure was high. Any strain, the more prolonged the strain the more certainty of hemorrhage occurring. The greater the hardening of the arteries the more certainty there is of a hemorrhage occurring, even though a man looked to be in perfect health."

There was no proof that the deceased had hardening of the arteries or high blood pressure.

We think the evidence clearly raised an issue of fact for the jury that the deceased died as the result of an injury received in the course of his employment. In the case of Southwestern Surety Co. v. Owens (Tex. Civ. App.) 198 S. W. 662 (writ refused), it was held that rupture of a blood vessel in the lung caused by lifting a can of paint was a compensable injury. And hernia caused by lifting has been held a compensable injury. Columbia Casualty Co. v. Ray (Tex. Civ. App.) 5 S.W.(2d) 230. In the case of Texas Employers' Ins. Ass'n v. Parr (Tex. Com. App.) 30 S.W.(2d) 305, it was held that where an aneurism from which an employee was suffering was caused to burst from excessive strain from overwork that the injury was compensable. In the case of Texas Indemnity Ins. Co. v. Wilson (Tex. Civ. App.) 281 S. W. 289, it was held that injury from strain arising while assisting in carrying a "straddle jack" was compensable. In Georgia Casualty Co. v. Mixner et al. (Tex. Civ. App.) 289 S. W. 420, 422 (writ refused), a paralytic stroke suffered by Mixner while straining and pulling on a rope while hoisting a heavy electrical machine was held to be a compensable injury. In the latter case the facts are quite similar in many respects to the facts of this case. In the course of the opinion, Chief Justice Pleasants, speaking for the court, said:

" * * * In Boyd on Compensation Laws, § 458, it is said:

" 'Strain sustained by employees of normal health in the course of their employment are generally regarded as accidental injuries. Ruptures resulting from lifting heavy objects are generally held fortuitous and unexpected events; in other words, accidents.'

"The decisions of our courts recognize and follow the rule above stated, and hold that an injury caused by strain or overexertion in performing the work required of one in the course of his employment is an injury for which compensation is provided under our statute. Texas Employers' Ins. Ass'n v. Jimenez (Tex. Civ. App.) 267 S. W. 752; Texas Employers' Ins. Ass'n v. Moore (Tex. Civ. App.) 279 S. W. 516; Southwestern Surety Co. v. Owens (Tex. Civ. App.) 198 S. W. 662."

Appellee insists that this case is controlled by the case of Southern Casualty Co. v. Flores (Tex. Com. App.) 1 S.W.(2d) 260, 261. That case is not in point on the facts. There the employee had done no work on the occasion of the alleged injury. He had just come to work and then took a few steps along a walkway, apparently to sign a work ticket, when he fell. His death was shown to have been due to disease. In the course of the opinion Judge Nickels said: "Syphilis and its resultant, of course, had no origin in the employment. Their presence in that degree which converted the slightest physical exertion into invitation to death being shown by evidence in which there is no contradiction, the case belongs to that class in which the supposed 'injury' comes 'from a hazard to which the workman would have been equally exposed apart from the employment,' and, hence, is noncompensable. * * * The testimony relied upon to uphold the claim includes admission that the slightest movement of a limb even while the person with that condition of heart is asleep in bed might well consummate death. The element of 'causative danger * * * peculiar to the work,' etc., is lacking."

But appellee contends that, since there was no proof that Theago had high blood pressure or hardening of the arteries predisposing him to paralysis from overexertion or strain, and there being, as it contends, no proof that he suffered the rupture of a blood vessel in his brain, no issue was made that his death resulted from injury. We think this contention is without merit. The fact that Theago suffered the stroke while doing heavy fast work and while in the very act of exerting himself and straining in an effort to lift a portion of a heavy scaffold, followed by paralysis and death, as more fully set out above, when considered in the light of the expert medical testimony of Dr. Brumby, was ample to raise the issue of a direct causal connection between the exertion and strain and the paralysis which produced his death. And it is immaterial that Dr. Brumby's testimony to the effect that deceased probably had hardening of the arteries, high blood pressure, or some predisposing condition were merely inferences. They were such inferences as a medical expert might properly make from the facts shown.

For the error discussed, the judgment of the trial court is reversed, and the cause remanded for a new trial.