## TRAVELERS INS. CO. v. JOHNSON et al.

### No. 2759.

Court of Civil Appeals of Texas. Beaumont. June 12, 1935.

Rehearing Denied June 19, 1935.

Pipkin & Pipkin, of Beaumont, for appellant.

Curtis W. Fenley, of Lufkin, and W. T. McNeill, of Beaumont, for appellees.

O'QUINN, Justice.

This suit arose under the Workmen's Compensation Law of Texas (Vernon's Ann. Civ. St. art. 8306 et seq.). Marguerite Johnson, the surviving wife, and Callie Johnson, the surviving mother, and Marguerite Johnson, as next friend of Jack Johnson, Jr., the minor child of Jack Johnson, Sr., deceased, filed this suit in the district court of Jefferson county, against the Travelers Insurance Company, to set aside an award of the Industrial Accident Board denying them compensation, and to recover

compensation for the death of Jack Johnson, Sr., deceased.

The International Creosoting & Construction Company, doing business at Beaumont, Jefferson county, Tex., was the employer and subscriber, Jack Johnson, Sr., the employee, the Travelers Insurance Company was the insurance carrier, and appellees were the sole beneficiaries and heirs of Jack Johnson, Sr., the deceased.

Appellees, plaintiffs below, alleged the usual and necessary facts to maintain the suit. It was alleged that about November 3, 1933, Jack Johnson, Sr., was employed as a day laborer by the International Creosoting & Construction Company, at its plant in Beaumont, Jefferson county, Tex.; that on about said date said Johnson, while engaged in the course of his employment, sustained an accidental personal injury which resulted in his death; that such injury was incident to and arose out of his employment; that while he was engaged in doing a necessary part of his duty in such employment, to wit, operating, in connection with other employees, a wrench and tightening the drums or cylinder heads on one of the large cylinders used in treating material, he accidentally strained and jerked himself in operating said wrench, causing a blood vessel, to wit, the aorta, a large artery and blood vessel leading out of the heart, to rupture, which caused internal flooding of the blood and injury which caused his death within a short time. It was further alleged that said Johnson, while working at said wrench and exerting great strength and unusually straining himself, accidentally lost his hold of the lever of the wrench and fell to the cement floor, striking his head on the cement, causing a severe blow on the back of his head, which was also a producing cause of his death. It was further alleged that at the time of the accident, deceased was engaged in hard physical labor; that the weather was unusually warm, and that the cylinder gave out artificial heat, which caused deceased to become hot, and which directly contributed to his death. It was alleged that deceased was thirty years of age, and was at all times a strong healthy man.

Defendant, appellant, answered by general demurrer, a number of special exceptions, general denial, and specially that the death of said Johnson did not result from any injury received by him while in the course of his employment; that he sustained no injury whatsoever, but that his death was caused by and resulted solely from sickness, disease, or natural causes which did not in any manner result from an injury, accidental or otherwise; that his death was not in any manner caused or contributed to by any injury.

The cause was tried to a jury upon special issues, in answer to which they found: (a) That deceased sustained an injury about the time alleged; (b) that the injury was sustained in the course of his employment; (c) that such injury was the "producing" cause of his death; (d) that "syphilis" was not the sole producing cause of his death; (e) and that manifest hardship and injustice would result to plaintiffs if a lump sum settlement was denied them. It was agreed that deceased was working under the $7 per week minimum wage rate.

Judgment was rendered in favor of appellees for compensation for 360 weeks, awarding $2,128 in a lump sum, one-third of which was awarded to their attorneys. Motion for a new trial was overruled, and the case is before us on appeal.

Appellant's first six propositions are presented together. They raise substantially the same question, that is, that the court erred in refusing its motion for an instructed verdict. It is insisted: (1) That the undisputed evidence showed that deceased did not receive any injury in the course of his employment, but that to the contrary his death was caused directly and solely by an aneurysm of the aorta brought on by the disease known as syphilis; (2) that it appeared from the undisputed evidence that deceased did not receive an injury, accidental or otherwise, in the course of his employment, at the time of or prior to his death; (3) that the evidence justified no more than a mere surmise that some strain caused the sudden rupture of an aneurysm of the aorta, and was not sufficient to raise the issue that deceased suffered an injury in the course of his employment resulting in death; (4) that the undisputed evidence showed that the death of deceased occurred solely from the effects of syphilis, which disease was of long standing, and was not the result of his employment, nor was it aggravated by any personal injury received in the course of his employment; (5) that the undisputed evidence showing that the death of deceased was caused by the bursting of an aneurysm of the aorta caused solely by syphilis, and that deceased did not receive any injury in the course of his employment, there was no evidence to support the jury's answer to special issue No. 1, that deceased sustained a personal injury; and (6) that the jury's answer to special issue No. 2, that deceased

sustained an injury in the course of his employment, was without support in the evidence and contrary to the undisputed evidence, so that it was error for the court to submit said issue to the jury.

■ Appellees, on the trial of the case, abandoned their allegation that when deceased fell he struck his head on the concrete floor and thereby received injuries which contributed to his death. It is undisputed, in fact agreed, that deceased died from a rupture of an aneurysm of the aorta. The contest is whether such rupture was the effect of exertions or labor deceased was doing at the time of the rupture of the aneurysm.

The record discloses that deceased, at the time of his death, was working for the creosoting company and the immediate time at the cylinder head of a large metal boiler or cylinder 140 feet long with 14 foot openings at each end, into which logs or timbers were put for creosoting. The logs were run into the cylinders on a steel car used for that purpose, and then the ends of the cylinders closed by heads fastened by about 75 bolts some $2\frac{1}{2}$ inches in diameter held and tightened by nuts on the bolts being screwed tight. These nuts on the bolts were screwed up or tightened by the use of long, heavy, metal levers fitting onto the nuts and manipulated by several men to the lever. This was done by pulling up or down on the lever and by the men stepping upon and throwing their weight and strength on same, so as to cause the nuts to turn and tighten the heads on the cylinders. While engaged in this work, and just after throwing his weight on the lever, and while in the act of again placing his foot on the lever, deceased suddenly fell over and died. This was right about the noon hour. The weather was warm, and the cylinder radiated heat from the hot creosote and steam pressure being used. The work was heavy and the movements in screwing up the nuts in tightening the cylinder heads rapid. Four men, including deceased, were operating the lever at the time deceased fell dead.

An autopsy was performed on deceased at the instance of appellant, and it was found that an aneurysm at the root of the aorta was ruptured, that is, it had burst and caused the quick death of deceased. Dr. Martin, who performed the autopsy in connection with Dr. Lewis, testified:

"Q. A young negro man thirty years of age, working every day at fairly difficult physical labor, apparently in the best of health, never complained of pains or had a cough, not emaciated, didn't lose sleep, and operating a good sized wrench in place, tightening up bolts or nuts on the head of a cylinder where you put concrete—assuming he is operating a wrench with other men, pulling up and pulling down, and he keels over all of a sudden, when he is helping those men operate that wrench, would you or not say the exertion he was put to was the producing cause of the breaking of aneurysm? A. It could be and it could not be, but it could be."

He testified that exertion or work increased the blood pressure; that exercise caused the blood pressure to rise; that this rising of the blood pressure caused extra force or pressure on the walls of the arteries. He further testified that Dr. Lewis ran a slide or smear of the blood taken from the body and it "showed four (4) plus syphilis," and:

"Q. Now when this—you call it a rupture—when it takes place, do you refer to that as being an explosive process or a finally eating out and giving away of the wall? A. Well, it is hard to tell after death. You can't tell for sure, but evidently it just reached the rupture stage and went through.

"Q. Is that your opinion of this case? A. Yes, sir; that is my opinion.

"Q. Then is it your opinion the wall having weakened and weakened—that the disease finally ate through the wall and he died? A. That is possible, but not probable.

"Q. Why do you say that? A. Because the man was working and his pressure up."

Dr. L. C. Powell, testifying as to whether a plus four Wasserman test is proof of an advanced aneurysm, answered that it might be, and it might not be. And:

"Q. I will ask you this, doctor, assuming you have a young negro man about thirty years of age, in good health, average size and heighth, who has done day labor all of his life, never had any pains, hadn't lost his appetite, didn't suffer from restlessness at sleeping time, wasn't emaciated, and worked every day, worked at manual labor every day, in case he had an aneurysm, and he hadn't had any prior symptom of the disease, I will ask you whether or not ordinarily it would take exertion on his part to cause that aneurysm to break? A. Ordinarily, yes, sir.

"Q. It is the unusual thing for a young man in apparently good health, as he seemed to be, to die of the breaking of an aneurysm without some prior warning? A. Rather unusual without some prior warning."

In answer to the question "whether or not the exertion or the work he was doing was a producing cause of the breaking of the aneurysm," he answered, "not only possible, but very probable." And further, on cross-examination:

"Q. Well, isn't it just as probable in this case, from a theoretical standpoint, that this aneurysm went on and ate through the vessel? A. Well, it is possible.

"Q. Why do you say it isn't probable? A. Because the man had been doing strenuous exercise—

"Q. And had been doing it for weeks and weeks? A. Yes, sir.

"Q. At this instant the similar exertion broke it through; is that your testimony? A. Yes, sir."

And:

"Q. Have you ever seen a heart that was diseased from syphilis? A. Yes, sir.

"Q. Is syphilis a common cause of aneurysm around that section; around that area? A. Yes, sir.

"Q. It causes most of them, doesn't it? A. Yes, sir; most of them.

"Q. Does a man ever die of an aneurysm? A. Sometimes of whatever does check or stop the eating or corroding of that thing that causes the aneurysm; whatever stops that. I don't know. They don't always stop. Some reach a certain stage and stop. Why we don't know.

"Q. There must be some arresting treatment to stop this if it does not go on. You say some— A. They are not all treated.

"Q. They are not all treated? A. No, sir.

"Q. But if they are not treated that will go on through, won't it? A. Might, and might not. Lots of them that have never been treated never rupture."

And:

"Q. What he was doing there is another question, but to get back to my question. This syphilitic condition of the heart, if I may put it that way—this eating process there advanced to where it was almost through—now what is wrong with the theory or in the theory that it went through

like it had been going that moment would arrive at sometime wouldn't it? A. It might have and might not.

"Q. Well if it was still eating and going on its way, it is not the history of cases that it stops of its own accord— A. In some cases it does.

"Q. It stops there? A. Some people have died from other causes and you do an autopsy, and you find the aneurysm is stationed—

"Q. You find the other disease but the aneurysm beat it to it, isn't that right? A. I wouldn't say it beat it to it. You would have a hard time trying to prove death between the two."

Dr. Lewis testified that he assisted in performing the autopsy on deceased. He said they found the deceased was a syphilitic—an untreated syphilitic. Found an exploded aneurysm of the aorta which caused deceased's death. That in his opinion the aneurysm had existed for a long time—any time from six months to two years. That the aneurysm was a kind of pouchlike formation caused by the syphilitic effect of ulceration or eating process of the disease which progressed until the walls of the aorta became very thin and then bursted, causing the almost instant death of the deceased. That in his opinion exertion was not necessary to cause the rupture of the aneurysm. That he did not think the exertion of deceased in assisting in tightening up the cylinder heads by working at the lever caused the bursting of the aneurysm. That one in deceased's condition of syphilitic aneurysm was likely to die suddenly at any time—even in bed asleep or while walking along.

Marguerite Johnson, wife of deceased, testified that deceased was some 28 years old, strong, healthy, never sick, worked regularly at hard manual labor, ate heartily, and slept well. That he never complained of being unwell, coughed, or, so far as she knew, suffered pain or exhaustion. That on the morning of his death he left home for work apparently in the best of health. That he was about of average height and weighed around 170 pounds. That before he moved to Jefferson county and engaged in the work he was doing at the time of his death he lived at Kelty's in Angelina county, and worked at a sawmill.

Callie Johnson, the mother of deceased, testified that deceased was 30 years old,

when he died. That he was always a healthy, hard-working young man. She said: "No sir, I never called a doctor to him but once—he had a rising on his leg when he was about twelve years old. He never did have no kind of spells or nothing." That he was robust, strong, active, weighed about 160 or 170 pounds, and did hard physical labor all of his life, and contributed to her maintenance.

Matt Burnett, foreman under whom deceased worked at the creosoting plant, testified that on the day deceased died he was working for a Mr. Terry, another foreman at the plant, who had "borrowed" deceased to work at tightening up the bolts on the retort head on the cylinders in which material was put for creosoting. That the material was put into the cylinders, the cylinder heads tightened airtight, and hot creosote (sometimes pretty hot) pumped into the cylinders under steam pressure. He fully described the process of tightening the cylinder heads and the means of so doing. That the levers to the wrenches used in turning the nuts on the bolts were some four to five feet long and required several men to the wrench. That the tightening up work had to be done rapidly and finished before stopping. That deceased had once before worked under him at the plant—some year or two before —that all that time he had never heard him complain of any physical ailment, that he was a good worker and appeared to be all right. That the day deceased fell out was hot, "pretty warm."

David Guidry, a fellow workman, testified that he, deceased, and others had been "borrowed" to help in tightening up the cylinder heads, and while they were working, deceased suddenly toppled over. That four men, including deceased, were working the lever to the wrench used in turning the nuts on the bolts. That he did not hear deceased make any complaint. That when deceased suddenly fell over, he thought that he was overheated and tried to lift him up.

Without further reference to the record, it is seen that the evidence raised the issues submitted, and amply supports the findings of the jury. It is true that deceased was an untreated syphilitic, and that his death was caused by the rupture of a syphilitic aneurysm of the aorta, yet it is also equally true that he was a robust young man, apparently in the best of health, never complained of any physical ailment, was strong, active, and a good and willing worker. He was used to and had performed hard manual labor all of his life, and there is no evidence of his having at any time been disabled from work by any sort of physical troubles. It is beyond question that physical exertion, especially hard manual labor, increases the blood pressure, and that the rising of the blood pressure causes extra pressure on the walls of the arteries. At the very instant of deceased's falling dead, and for some time before, he was working at a wrench that required the combined efforts of four men to turn, constantly and rapidly throwing his strength and weight on the lever handle of the wrench to turn the nuts tightening the numerous bolts of the cylinder heads. The weather was warm and the cylinder radiated heat from the hot creosote with which it was filled by steam pressure. All of this combined to cause the hastened flow of deceased's blood and the rising temperature of his body. According to the testimony of expert witnesses, this could, and very probably did, cause the aneurysm to rupture and kill deceased. Moreover, it was shown that some such aneurysms without treatment, become stationary, that is, the eating process of the disease for some reason ceases, and the aneurysm never ruptures. The history of deceased's affliction, measured by his robust, active, and outward apparent continued good health and ability to do strenuous labor, pretty strongly indicates that his aneurysm was of that class. As we have said, the evidence not only raised the issues, but amply supports the jury's findings. Texas Employers' Ins. Ass'n v. Parr (Tex. Com. App.) 30 S.W. (2d) 305; Fidelity Union Casualty Co. v. Martin (Tex. Civ. App.) 45 S.W.(2d) 682; Theago v. Royal Indemnity Co. (Tex. Civ. App.) 70 S.W.(2d) 473. The assignments are overruled.

The sixth and seventh propositions challenge as reversible error the definition of the expression "producing cause" given in the court's charge in connection with special issue No. 3.

Special issue No. 3 inquired whether the personal injury received by deceased was "a producing cause" of his death, and defined the term "producing cause" as "such as naturally resulted in the death of said Jack Johnson." This definition was objected to because the element of causal connection was not contained in the defini-

tion, it being insisted that the term "producing cause," when used in purview of the Workmen's Compensation Act, means that it "must be that cause which, in a natural and continuous sequence, produces the death in issue, and without which the death would not have occurred," thus, it is said, permitting the jury to find (a) "an injury was the producing cause of the death of deceased, even if there was no causal connection between the injury and the disease from which deceased died"; and (b) "that the death of deceased resulted from the alleged injury, even though the disease which indisputably brought about the death of deceased was an intervening independent agency constituting the sole cause of the death."

We overrule the assignments. The contention of appellant, in effect, is that the producing cause of the injury must have been the "proximate cause" of deceased's death. Proximate cause is not an issue in compensation cases. All that is necessary to be shown is that the injury was a producing cause of the disability or death in issue. It is true that a causal connection must be shown between the injury and the death of an employee before compensation for the death can be had. But if the injury is shown to be a producing cause of the death, then a finding that the death resulted from the injury is justified, if the injury arose out of and was received in the course of his employment. Travelers' Ins. Co. v. Peters (Tex. Com. App.) 14 S.W.(2d) 1007. It has been held that the expression "producing cause" is not such a legal term as should be defined, Texas & P. Ry. Co. v. Short (Tex. Civ. App.) 62 S.W.(2d) 995 (writ refused), but as the court undertook to define it, his definition should not be incorrect or misleading.. However, we think the definition, under the facts, proper. "Producing" means bringing about; to cause to happen or take place, as an effect or result. "Natural" or "naturally" means arising under the ordinary operation of physical laws; produced in the course of nature; resulting in the ordinary course of things. So, when the court told the jury that "producing cause" was such a cause "as naturally resulted in the death" of the deceased, he but gave the words their correct and usual meaning, that is, that the injury received by deceased must have been the cause which in its very nature would or did result in his death. At the time of his death, and for many years prior thereto, deceased was apparently in good health, worked constantly at hard manual labor, was strong, active, and had no symptoms of disease. The evidence showed that the work he was doing would cause rising or increased blood pressure, thereby causing increased pressure on the walls of the arteries, and it is, we think, reasonably certain that this increased pressure caused the rupture of the aneurysm, and this certainly caused his death. The death was the natural result of the bursting of the aneurysm, and the bursting of the aneurysm naturally resulted from the increased blood pressure which naturally increased because of the strenuous exertion—work—he was performing in the course of his employment.

Other assignments are presented and have been considered, and it is not thought any of them show error. The judgment is affirmed.