**TEXAS EMPLOYERS INS. ASS'N v. WRIGHT et al.**

No. 3286.

Court of Civil Appeals of Texas.
Beaumont.

June 14, 1938.

Rehearing Denied June 22, 1938.

R. E. Minton, of Lufkin, and Minton & Minton, of Hemphill, for appellant.

J. R. Beck and W. R. Cousins, both of Beaumont, and L. E. King, of Hemphill, for appellees.

O'QUINN, Justice.

This is a compensation case by appellees, the heirs of Sallie Wright, against appellant, Texas Employers Insurance Association, filed in the district court of Sabine County as an appeal from an adverse award of the Industrial Accident Board; appellant was the compensation insurance carrier; Temple Lumber Company the employer; G. H. (George) Wright the employee, who died the 20th day of March, 1934; Sallie Wright, the surviving widow of George Wright, died the 26th day of July, 1935— she and her deceased husband had no children; appellees are the heirs of Sallie Wright, deceased, and as such filed this claim before the Industrial Accident Board for compensation for the death of George Wright, and filed and prosecuted this appeal from the award of the Industrial Accident Board. On the verdict of the jury, finding the basic facts, judgment was entered in favor of appellees against appellant for compensation at the rate of $18.48 per week for 360 weeks, beginning the 20th day of March, 1934. From the judgment appellant has duly prosecuted its appeal to this court.

We quote appellant's first proposition advanced under the seventh assignment of error:

"This suit being by the heirs of Sallie Wright for a chose in action, filed within four years after her death, it was indispensable that plaintiffs should both allege and prove that there was no administration pending on her estate and that none was necessary."

We quote appellant's seventh assignment of error:

"The trial court erred in overruling defendant's motion for instructed verdict, because the plaintiffs wholly failed to discharge the burden of proof resting upon them to show continuing good cause existing at all times prior to the filing of claim with Industrial Accident Board on July 29th, 1935, for the failure of Sallie Wright to file a claim for compensation with the Industrial Accident Board during said period of time."

The proposition is not germane to the seventh assignment of error, nor to any other assignment of error brought forward by appellant in its brief. Under the following rule announced by 3 Tex.Jur. 887, the proposition is overruled:

"A germane proposition is one which is relevant to the assignment upon which it is based; a proposition is not germane if it deals with a different subject or raises a different question. * * *

"In considering propositions, an appellate court is confined to those based upon and germane to some assignment of error appearing in the record and brought forward in the brief."

See, also, Columbian Nat. Fire Ins. Co. v. Dixie Co-op. Mail Order House, Tex.Com. App., 276 S.W. 219.

Appellant asserts by its second proposition that appellees' petition was subject to a general demurrer "for failure to negative the four exceptions in the statutory definition of 'injury sustained in the course of employment', of Article 8309, Paragraph 5, Subparagraph 4, Revised Statute of 1925"; appellant thus states the four exceptions:

"(1) by the act of God; (2) by the act of a third person intended to injure him because of reasons personal to him and not directed against him as an employee; or because of his employment; (3) was not received by him while in a state of intoxication; (4) nor by the employee's wilful intention and attempt to injure himself, or to unlawfully injure some other person."

We quote as follows from appellees' petition:

"Plaintiffs allege and say that heretofore on or about May 20, 1934, the said G. H. Wright was an employee of the Temple Lumber Company in Sabine County, Texas, and elsewhere in the capacity among other things as assistant woods foreman, and that it was his duty to make and assist in making surveys for tram-roads and in constructing, maintaining, and repairing tram-roads and lines of the said employer and to assist therein and in general to perform such tasks as might be assigned to him by the said Temple Lumber Company.

"That on or about the 17th day of March, A. D., 1934, said G. H. Wright was notified by his employer, its agents, servants, employees and representatives that a tram-road bridge was burning on the tram-road front of his said employer and was ordered to extinguish said fire and rebuild and repair said bridge; that said G. H. Wright immediately went to the said burning bridge on said day and date and assisted in the extinguishing of said fire, thereby strenuously exerting himself, became excited and straining himself, causing injuries to the body in general and especially the heart which caused or contributed to the cause of his death; that thereafter on or about the 18th and 19th days of March, A. D., 1934, said G. H. Wright worked and assisted in the repairment of said bridge working day and night on or about the 20th day of March, A. D., 1934 while continuant in the scope of his employment with the said Temple Lumber Company did survey a tram-road on the Temple Lumber Company's front thereby greatly exerting himself and subjecting his body and heart and other members of his body to great strain and fatigue, and that on said day and date said G. H. Wright died as a result of the extraordinary effort, strain, and fatigue as aforesaid.

"Plaintiffs say that on or about the 17th, 18th, 19th and 20th days of March, A. D., 1934, the said G. H. Wright was actually engaged in the scope of his employment with the said Temple Lumber Company and in the performance of his duties as its employee and worked for long hours under great strain and stress and excitement becoming fatigued and being subjected and exposed to the elements which on said days and dates were severe and that by reason of

·such, the said G. H. Wright suffered injury and harm to his body which caused or contributed to the cause of his death on or about the 20th day of March, A. D., 1934; that the said G. H. Wright suffered actual injuries while engaged in the course of his employment and the same was received in the usual course of his said employer's business and that said injuries were the cause or contributing cause of his death."

Appellees were entitled to all general intendments to be deduced from their petition; under this rule the petition, in the respects challenged, in the absence of special exceptions, was not subject to the general demurrer. The following authorities support appellees' petition: 45 Tex.Jur., page 803; Federal Underwriters Exchange v. Warren, Tex.Civ.App., 86 S.W.2d 824, writ dismissed; Southern Surety Company et al. v. Weaver et al., Tex.Com.App., 273 S.W. 838.

■ By assignments of error Nos. 5 and 6, appellant complains that certain hypothetical questions propounded by appellees to Dr. R. D. Cousins were without support in the evidence in the following respects:

"(1) There was no testimony in the record up to that time showing that Geo. H. Wright, while the burning bridge was being put out, walked up and down any railroad dump eight or nine feet high;

"(2) There had been no testimony introduced showing that Geo. H. Wright chopped with an axe on the heavy timbers of the bridge for two hours while the bridge was being put out;

"(3) There was no testimony to show that at all times during the two-hour period Geo. H. Wright was in a hot place with smoke and heat all around him;

"(4) There was no testimony offered by any witness showing that when Geo. H. Wright stopped about the middle of Runyan Hill in lighting a cigarette that he remarked that he was bellowsed like a mule from fighting fire on Saturday night."

The following summary of the evidence, taken from appellees' brief, sufficiently answers these assignments:

"As seen by the statement the witness, Bency E. Ener, testified that Mr. Wright got upon the railway dump, which was 8 feet above the level of the stream, and the witness R. E. Jacks testified that the bridge must have been 8 or 9 feet high. This testimony is sufficient to base the statement that G. H. Wright walked up and down a rail-

way dump 8 or 9 feet high, since it naturally follows that a bridge 8 or 9 feet high will have a dump practically that high. The witness, Bency E. Ener, having testified that G. H. Wright he reckon, chopped for maybe two hours, chopping some heavy timbers in two. He further testified that it was hot where Mr. Wright was, that he was facing the heat and smoke. Appellees think his testimony sufficient to base the statement that G. H. Wright had finally got an axe and chopped for an hour or two and chopped heavy timber on the bridge in two, and at all times being in a hot place with heat and smoke all around him.

"The testimony of Paul Durham that G. H. Wright stated that bridge burning out he didn't get much rest as he ought to, he was like those old mules, he was bellowsed. That he played out, and further testified that bellowsed means wind-broke, was sufficient upon which to base the statement of hypothetical question that G. H. Wright remarked that he exhausted or bellowsed like a mule, from fighting fire on Saturday night."

In Decatur Cotton Seed Oil Co. v. Belew, Tex.Civ.App., 178 S.W. 607, the court said (page 614):

"All that is required in such cases is that the evidence is substantially embodied in the hypothetical question."

See, also, Trinity & B. V. Railway Co. v. McCune, Tex.Civ.App., 154 S.W. 237, where it was said (page 238):

"The fourth assignment complains of the admission of the testimony of Dr. Simpson, a witness for plaintiff, in answer to a hypothetical question, because the question assumed something not warranted by the evidence, to wit, 'that the plaintiff was unable to put his foot on the ground at a time two or three weeks after his alleged injury.' There was evidence which showed substantially that plaintiff was unable, two or three weeks after his injury, to put his foot on the ground. It is not necessary for a hypothetical question to embrace precisely the language of the evidence. It is sufficient if it imports substantially what the evidence shows. Gulf, C. & S. F. Railway Co. v. Compton, 75 Tex. 667, 13 S.W. 667; Kemendo v. Fruit Dispatch Co. [61 Tex.Civ.App. 631], 131 S.W. 73."

■ Under assignments of error Nos. 7, 9, 11, 12, 13, 16 and 17, appellant advances the following proposition:

"The burden is upon a compensation claimant, in order to excuse the late filing

of his claim, to show that good cause existed up to the time of the filing of the claim. * * *

"Where the compensation claimant who has failed to file claim within six months after death of employee, fails to show good cause excusing delay in filing for the entire period until claim is filed, it is the duty of the trial court to instruct a verdict against claimant."

The issue of "good cause" was submitted by the following question:

"Do you find from a preponderance of the evidence, that the physical and mental condition of Sallie Wright, from the 20th day of March, A.D.1934, to and including the 29th day of July, A.D., 1935, was such as to furnish good cause for her failure to file her claim for compensation with the Industrial Accident Board until on or about the 29th day of July, 1935?"

In connection with this issue the court gave in charge to the jury the following definition:

"You are instructed that the term 'good cause' as used herein is such a cause as would be considered a reasonable excuse by a person of ordinary prudence reasonably mindful of his own interest under the same or similar circumstances."

On the issue of "good cause" appellees plead as follows, quoting from their counter propositions:

(a) "That Sallie Wright had filed a claim within 6 months after date of the death of G. H. Wright and, in the alternative, that Sallie Wright's physical and mental condition was such under the existing circumstances from the date of the death of G. H. Wright, on March 20, 1934, to the date of filing a claim on July 29, 1935, as to furnish good cause for her failure to file a claim prior to that time, and that she used reasonable diligence in filing her said claim and introduced evidence to the effect that she was a sick woman from the time of the death of G. H. Wright until her death on July 26, 1935, unable to look after business, taking various medicines and opiates, and being unable to rest, and mentally weak and unrational at intervals, there being sufficient evidence in the record to sustain an affirmative finding of good cause.";

(b) "That Sallie Wright had filed a claim within 6 months after date of the death of G. H. Wright and, in the alternative, that Sallie Wright's physical and mental condition was such from the date of the death of G. H. Wright, on March 20, 1934, to the date of filing a claim on July 29, 1935, as to furnish good cause for her failure to file a claim prior to that time, and introduced evidence to the effect that she was a sick woman from the time of the death of G. H. Wright until her death on July 26, 1935, unable to look after business, taking various medicines and opiates, and being unable to rest, and mentally weak and unrational at intervals, there being sufficient evidence in the record to sustain an affirmative finding of good cause.";

(c) "That Sallie Wright's physical and mental condition was such from the date of the death of G. H. Wright, on March 20, 1934, to the date of filing a claim on July 29, 1935, as to furnish good cause for her failure to file a claim prior to that time, and introduced evidence to the effect that she was a sick woman from the time of the death of G. H. Wright until her death on July 26, 1935, unable to look after business, taking various medicines and opiates, and being unable to rest, and mentally weak and unrational at intervals."

The following quotations from the evidence support appellees' counter propositions that the issue of "good cause" is supported by the evidence. We have given above the date of the deaths of George Wright and of his wife, Sallie Wright. A day or so before her death Sallie Wright made out and duly executed a formal claim to be filed with the Industrial Accident Board; this claim did not reach the Board until about three days after her death.

The witness, Lonnie Wright, testified as follows:

"I have testified that Mrs. Sally Wright was my sister. I was closely associated with Sally Wright during the period from March, 1934, until her death in July, 1935. My wife and I lived pretty close to Sally Wright and we stayed with her most of the time; we stayed with her about two-thirds of the time. I saw Sally Wright every day. At the time of Mr. George Wright's death in March, 1934, Sally Wright had high blood pressure, heart trouble and asthma. She was a sick woman. During the period from March, 1934, until July, 1935, we had to carry Sally Wright to the hospital to stay about ten days and she was under treatment of the Doctor all time, and we had to carry her back to the hospital for treatment once every week and sometimes

we would have to leave her at the hospital for about ten days at the time; we carried her to the hospital two or three times after my brother-in-law died; she stayed ten days beside the other times we carried her for treatment. My brother, Wesley Wright, stayed with Sally Wright; that was my single brother that was with her. Sally Wright had a negro cook with her. Sally Wright did not do any work. Sally Wright did not buy the groceries around the house, she was not able to do any work. There was nothing else wrong with Sally Wright that I know of except heart trouble and asthma. Sally Wright was in bed most of the time; she would be in bed for weeks at the time and sometimes she would be up for a few days, but she was in bed most of the time. During the time Sally Wright had smothering spells and she would spit up blood. Sally Wright was a nervous person. The condition that she was in, her health, caused that nervousness; she worried lots. Mrs. Wright was a sick woman and not able to look after her affairs from March 20, 1934, until July, 1935, when she died.

"By Mr. Minton: We object to that as a conclusion.

"By the Court: The objection is sustained; let him tell her condition.

"Sally Wright did not tend to her business; by brother tended to it for her; when he wasn't there my wife and I tended to it for her and when I wasn't there some of us tended to it for her. Sally Wright was sick a long time before her death, she had several spells. When she had these spells she would nearly die with heart trouble and asthma and sometimes she wasn't at herself. Her mind was affected at times, it taken so much dope. The dope that she took was ease medicine. Dr. Hardy give her medicine and also Dr. Slay. If she had a bad spell and we couldn't get her to Dr. Hardy, we would use Dr. Slay. The medicine that she took affected her mind, and normally, we was weak. Some nights Mrs. Wright didn't sleep any. When Mrs. Wright wouldn't sleep at night she would be to where she couldn't get her breath hardly and she would be spitting up blood. When Mrs. Wright did that we would always get a Doctor and he would give her a shot in the arm and some kind of ease medicine. Her blood pressure was usually around two hundred and fifty. When Mrs. Wright couldn't sleep at night we would have to prop her up in bed with pillows."

The witness, Mrs. Sadie Wright, the wife of Lonnie Wright, testified as follows:

"I was acquainted with George Wright and his wife Sally Wright. I lived with them along about the time of Mr. Wright's death. * * * I didn't have my household furniture in the house with her (Mrs. Wright) up until he died, then after he died I moved in the house with Mrs. Wright and stayed with her about two months. After I moved out of the house with Mrs. Wright I came backwards and forwards.

"Mrs. Sally Wright was a sick woman during all that time. Mrs. Wright had high blood pressure and heart trouble and asthma. * * * Mrs. Wright had spells. * * * Those spells were not regular, but if she got worried or excited or anything she would have one, or if she stayed up too much or worried around in the house."

The witness, Wesley Wright, testified as follows:

"After George Wright died I lived with my sister, Sally Wright. I lived with Sally Wright up until she died. I started staying with Sally Wright about three days before her husband died.

"From the time George Wright died until Mrs. Sally Wright died her health was bad. Mrs. Sally Wright had high blood pressure and asthma and heart trouble of some kind. Mrs. Sally Wright did not do the work around the house."

"Mrs. Wright took medicine. Mrs. Wright took medicine every day, usually every night. She took rest medicine. She got that medicine from the Doctor."

The witness, W. R. Cousins, testified as follows:

"I am a layman, but Mrs. Wright acted like folks I have seen that said they had high blood pressure; she was rather weak, and little hazy, staggering; I understood later she had very high blood pressure."

With reference to the letter dated April 15, 1935, the witness, W. R. Cousins, further testified as follows:

"I imagine I had talked to Mrs. Wright prior to the writing of this letter, the reason I did, if I talked to her before she wrote that letter, and I think Mrs. Wright recites she had been sick and her husband had been sick and a lot of trouble. * * I stated that Mrs. Wright sent for me. I was in Mrs. Wright's home; I passed there one Sunday evening and stopped a little to go in. * * * I didn't make any

trade with her about the claim, a little later I think I did;"

"After relating the facts to me, Mrs. Wright inquired of me whether I thought she was entitled to insurance; it is quite hazy, only I remember telling her to take it up with the right parties and see if it was too late. Ordinarily the lawyer handles that, but I didn't handle it. Sometime later I did make out a claim."

The witness, Lonnie Wright, testified as follows:

"Mr. Wright got up about five-thirty on Tuesday morning, March 20, 1934. * * That is the day he died."

On the following authorities the verdict of the jury finding "good cause" has support: Consolidated Underwriters v. Seale, Tex.Civ.App., 237 S.W. 642; Employers' Liability Assurance Corp. v. Mills, Tex.Civ. App., 81 S.W.2d 1028; Petroleum Casualty Co. v. Dean, Tex.Civ.App., 92 S.W.2d 1140; Williamson v. Texas Indemnity Ins. Co., 127 Tex. 71, 90 S.W.2d 1088; Texas Employers' Ins. Ass'n v. Bradshaw, Tex. Civ.App., 27 S.W.2d 314; Texas Employers' Ins. Ass'n v. Clark, Tex.Civ.App., 23 S.W.2d 405; Texas Employers' Ins. Ass'n v. Martin, Tex.Civ.App., 296 S.W. 639.

■ But it is our further conclusion, on the undisputed evidence, that Mrs. Wright duly filed her claim with the Industrial Accident Board within six months after the death of her husband, who died on the 20th of March, 1934; this issue was also plead by appellees. On the 8th day of May, 1934, she wrote the Industrial Accident Board the following letter:

"5/8/1934.

"R. L. Daniel, Ins. Commision

"Austin, Texas.

"Dear Sirs: I am writing you for information as to whether I am entitled to any Insurance for the Death of My Husband Geo. H. Wright who died with an Heart Attack while on duty with the Temple Lbr. Co. as Woods Foreman and has been woods Foreman for them for Nine or ten years he left Home feeling alright on the morning of March 20th, 1934 and fell dead out there about one oclock so please advise me as to wether I am entitled to any Insurance for I sure do need it.

"Hoping to hear from you soon

"[Signed] Mrs. Geo. H. Wright

"Box 344

"Pineland, Tex."

This letter was duly received by the Board, Mrs. Wright's claim was duly docketed, and her husband's employer duly notified. These facts constituted a due filing of the claim with the Industrial Accident Board. Rules for Courts of Civil Appeals, 62a, 149 S.W. x; San Antonio Street Ry. Co. v. Helm, 64 Tex. 147; Speer on Special Issues, Par. 450, at page 577; 45 Tex.Jur. 746, 747; Jarrett v. Travelers' Ins. Co., Tex.Civ.App., 66 S.W.2d 415; Security Union Ins. Co. v. Cartwright, Tex.Civ.App., 33 S.W.2d 1088; American Indemnity Co. v. Zyloni, Tex.Civ.App., 212 S.W. 183; Texas Employers' Ins. Ass'n v. Jimenez, Tex.Civ.App., 267 S.W. 752.

■ The questions submitting issues of "good cause", and the court's definition of that term, were not subject to the exception brought forward by the following proposition advanced under the 20th and 31st assignments of error:

"Where a claimant for compensation has failed to file claim with the Industrial Accident Board within six months after the death of the employee, it is the duty of the trial court after submitting the issue of good cause up to the filing of the claim, after having defined the term 'good cause', to also instruct the jury in connection with said definition of 'good cause' that such 'good cause' must have continued up to the date of the filing of the claim with the board."

Under the statement made in support of this proposition appellant brings forward no exception to the court's charge presenting this point. But the charge was in the approved form. Maryland Casualty Co. v. Lopez, Tex.Civ.App., 104 S.W.2d 526; Holloway v. Texas Indemnity Ins. Co., Tex. Com.App., 40 S.W.2d 75; Texas Employers' Ins. Ass'n v. Fulkes, Tex.Civ.App., 75 S.W.2d 320; Traders & General Ins. Co. v. Murphree, Tex.Civ.App., 88 S.W. 2d 744; Consolidated Underwriters v. Seale, Tex.Civ.App., 237 S.W. 642.

■ Under assignments Nos. 8, 10, 14 and 15, appellant contends that it was entitled to an instructed verdict on the ground that the evidence failed to show that Wright received an injury "while in the course of his employment as such"; and by assignment No. 20 that the court erred in submitting the issue to the jury. The following testimony of the witnesses answers this contention:

Bency E. Ener testified in part as follows:

"I really couldn't say what time I left the fire; I don't remember; it was just before night, just a short while. After we got back to the fire they taken those buckets and tried to put out part of the bridge and part of it had burned too bad. Those negroes they brought back took the buckets and Mr. Wright got on the bridge and had them to hand him up the water and he would pour it, some of it, and some of them would throw the water. It was hot up there where Mr. Wright was. Mr. Poindexter, Mr. Rose and myself did not do anything during that time; I didn't do anything, I laid down; we had just about exhausted ourselves. We turned it over to the fresh crew when they came. They got the fire kinda down on part of the bridge and the other part, about half of it, was burned, you might say, completely burned down; there was some timbers there and Mr. Wright taken an axe and cut off some of those timbers that was on fire trying to save part of the bridge and let part burn up. Mr. Wright cut off some timbers on the bridge. That was a railroad bridge. I think there was three of those timbers that Mr. Wright had to cut. I really couldn't say what size those timbers were, they were good large timbers. There was fire around where Mr. Wright was cutting, there was fire all around everywhere. You bet, it was hot there. The fire was smoking. The smoke was going around where Mr. Wright was, he was up over part of the fire, he was right up on the bridge. The biggest part of the fire was kinda out in front of Mr. Wright, he was facing what had burned. I couldn't say how long Mr. Wright was working cutting 'those timbers; I reckon he worked something like a couple of hours before we ever got that cut off. The place that Mr. Wright was standing to cut wasn't a convenient place to cut that timber because the timber was swinging out over the fire; it was an unpleasant place to stand where he was. I don't remember what time we went back to Pineland that night, it must have been somewhere near twelve o'clock, I suppose, I wouldn't be positive. We thought we had put out all the fire at the bridge before we left, but I understood the bridge burned after we left. We all went back on the same motor car. I had a conversation with Mr. Wright on the way back. We was all talking about being worn out and Mr. Wright said he didn't see how we kept that fire down as well as we did, he said he was plum exhausted from the time he went out there; those negroes were complaining about being burnt out."

The witness R. E. Jacks, testified as follows:

"I was in the bridge gang that built the new bridge in the place of one that had burned about four or five miles out on the main tram on the 18th of March, 1934, which was Sunday, and the 19th, which was Monday, of March, 1934. I worked both days in rebuilding that bridge. On Sunday, the first day, Mr. George Wright, I don't know his initials, was there overseeing the building of the bridge. Mr. Wright was there on Monday over-seeing the building of the bridge."

The witness, Paul Durham, testified as follows:

"Mr. Wright and I went up this hill to Runyan front where Mr. Barnes lived. * * * and he stopped and said that bridge burning out he didn't get as much rest as he ought to, he was like those old mules, he was bellowsed. Mr. Wright said the bridge burned out the day before and he didn't get the proper rest, he was like those old mules, he played out, he was getting old and bellowsed. Bellowsed means wind-broke; you take an old mule that 'is wind-broke and you call him bellowsed."

"It has been three or four years ago, but Mr. Wright must have died something right close to twelve o'clock, I don't remember just exactly;"

"I would say that supervising the rebuilding of that bridge out there would be part of Mr. Wright's duties, because Mr. Pollard wasn't there, you see."

The witness, G. S. Smith, testified as follows:

"Mr. Wright's duties were marking land lines, staking out spurs for railroad tracks, and anything that came to hand in connection with the logging."

The witness, J. J. Pollard, testified as follows:

"Mr. Wright was my assistant; he was just general foreman over the woods. When Mr. Wright went out and put the fire out on the bridge and carried the gang with him he was working in line with his duty.

R. D. Cousins testified:

"If a man, as we described in the hypothetical question, should take proper care of himself a number of them have lived many years. It seems to me that the exertion that this man had gone through with in the past two or three days was enough to precipitate a condition of that kind. I think that if this man had taken proper care of himself he would have probably lived for several years, and that the exertion is what brought on his death at that time. It is my opinion that the fellow suffered an injury or harm to the physical structure by exertion or exhaustion that brought on his death."

"I think that the facts related in the hypothetical question would be sufficient to begin an attack; he might not have felt it much, if he did at all, I don't know about it. Even though there was only a short period of Saturday night that his ordinary rest was broken, but under the circumstances I think that was probably the beginning of the attack. I never said that angina pectus was the cause of Mr. Wright's death; I said it was a heart condition, probably angina pectus, as they described the pain in the chest and arm."

Construed by the law announced in the following authorities, there can be no doubt that appellant's proposition on this point should be overruled. Texas Employers' Ins. Ass'n v. Lovett, Tex.Civ. App., 19 S.W.2d 397; Texas Employers Ins. Ass'n v. Shifflette, Tex.Civ.App., 91 S.W.2d 787; Consolidated Underwriters v. Murphy, Tex.Civ.App., 29 S.W.2d 831; Travelers Ins. Co. v. Johnson, Tex.Civ. App., 84 S.W.2d 354, 355; Fidelity Union Casualty Co. v. Martin, Tex.Civ.App., 45 S.W.2d 682; Theago v. Royal Indemnity Co., Tex.Civ.App., 70 S.W.2d 473; Guzman v. Maryland Casualty Co., Tex.Sup., 107 S.W.2d 356.

Question No. 26, submitted to the jury was as follows:

"Do you find from the preponderance of the evidence that the injury sustained by G. H. Wright, if you have found that he sustained any injuries in Special Issue No. 1, were sustained in the course of his employment with the Temple Lumber Company?"

In connection with this issue the court submitted the following charge:

"The term 'injury sustained in the course of employment,' as used in the Workmen's Compensation Law, does not include:

"1. Injury caused by the act of God, unless the employee is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public.

"2. An injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee or because of his employment.

"3. An injury received while in a state of intoxication.

"4. An injury caused by the employee's wilful intention and attempt to injure himself, or to unlawfully injure some other person:

"But shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer, received by an employee while engaged in or about the furtherance of the affairs of business of his employer whether upon the employer's premises or elsewhere."

Under its 18th assignment appellant advances the following proposition against the court's definition "injury sustained in the course of employment":

"It is the duty of the trial court, in connection with the defining of the term 'injury sustained in the course of employment,' to instruct the jury before they can find that such injury as was sustained by the employee was an injury sustained in the course of employment, they must first find by a preponderance of the evidence that said injury was not one of the four injuries which the statute prescribes are not included in the definition of 'injury sustained in the course of employment.' "

These assignments are overruled for two reasons; 1st, appellant makes no statement that the point presented by this assignment was called to the trial court's attention by a proper exception to the charge. Appellant rested under the duty both to except to the charge and to bring forward the exception in its brief; the assignment is without merit. Appellant cites no authority to support this assignment, and the following authorities support the court's definition. Texas Employers' Ins. Ass'n v. Hamor, Tex.Civ.App., 97 S.W. 2d 1041; Royal Indemnity Co. v. Hogan, Tex.Civ.App., 4 S.W.2d 93.

The trial court gave in charge to the jury the following definition of "injury" or "personal injury":

"The term 'injury' or 'personal injury,' as used in the workmen's compensation law [article 8309, § 1] means damage or harm to the physical structure of the body or such disease or infection as naturally result therefrom or the inciting and aggravating of any existing disease by damage or harm to the physical structure of the body."

Appellant presents the following proposition against this definition:

"The trial court should not submit to the jury a definition of a term which is more onerous than is provided by the law defining such term."

This proposition is overruled for the following reasons: 1st, Appellant makes no statement to the effect that it reserved any exception to the definition on the trial of the case; 2nd, The proposition is too general to suggest error; 3rd, On the facts of the case the charge was not subject to exception. Texas Employers Ins. Ass'n v. McGrady, Tex.Civ.App., 296 S.W. 920; Texas Employers' Ins. Ass'n v. Parr, Tex. Com.App., 30 S.W.2d 305; Traders & General Ins. Co. v. Murphree, Tex.Civ.App., 88 S.W.2d 744; 45 Tex.Jur. 492.

By assignments Nos. 21, 22, 23, 24, 25, and 26, appellant contends that the evidence did not raise the issues that George Wright, deceased, received a personal injury on or about the 17th of March, 1934; that his injury was "accidental"; that he sustained an injury while working as an employee of the Temple Lumber Company; that his injury was sustained "in the course of his employment with the Temple Lumber Company"; that the injury resulted in the death of George H. Wright; that the injury was the producing cause of the death of George H. Wright; that the injury "contributed to bringing about the death of George H. Wright". These issues were all submitted to the jury and answered against appellant. Quotations given above from the evidence deny appellant's contention that these issues were not raised as fact issues for the jury. The evidence quoted above also denies appellant's contention that Temple Lumber Company did not have due notice of the injury to George H. Wright.

By assignments Nos. 33 and 34, appellant brings forward the following allegations from its motion for a new trial:

(a) "Because after the trial of this cause and while the jury was deliberating upon its verdict returned herein, the jury discussed the question of the amount of attorney's fees, or the portion of recovery which the attorney, W. R. Cousins, would get in case of a recovery, some saying that he would probably get half of the recovery, and some saying that he would get less than half of the recovery; that the discussion of the question of attorney's fees of W. R. Cousins in case of recovery was a rather free discussion among the jurors."

(b) "That during the deliberations of the jury upon the verdict herein rendered, while the jury was discussing the question and answer to special issue No. 7 as to whether or not the physical and mental condition of Sallie Wright from the date of her husband's death to the date of the filing of the claim on July 29th, 1935, furnished sufficient good cause for her failure to file claim with the board prior to July 29th, 1935, one of the jurors, during said discussion and deliberation, related to the jury that he had known Sallie Wright and knew of her physical and mental condition and so related same to the other jurors."

Under these assignments appellant asserts that the court committed error in refusing to hear evidence on the issues raised by its motion for new trial. These assignments are overruled. Appellant makes no statement in support of its assignments of error; it fails to bring forward in its brief, as a part of its statement, quotations supporting its assignments of error. Again, the motion for a new trial was not verified, nor was it supported by the affidavits of the jurors. On this statement the court did not abuse its discretion in refusing to hear evidence in support of the allegations in the motion. Milwaukee Mechanics' Ins. Co. v. Frosch, Tex.Civ.App., 130 S.W. 600; Colclazier v. Moore, Tex.Civ.App., 6 S.W.2d 377; Haskins v. Henderson, Tex.Civ.App., 2 S.W. 2d 864; Wichita Home Insurance Co. v. Montgomery, Tex.Civ.App., 4 S.W.2d 1041.

The judgment of the lower court is in all things affirmed.

Affirmed.