## COLWELL v. UNITED STATES FIDELITY & GUARANTY CO.

### No. 11207.

Circuit Court of Appeals, Fifth Circuit.

Dec. 13, 1945.

Rehearing Denied Jan. 8, 1946.

Frank B. Clayton, Joseph H. McBroom, and Astor L. Carlton, all of El Paso, Tex., for appellant.

Allen R. Grambling, of El Paso, Tex., for appellee.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Plaintiff (appellant), individually, and as guardian of the estate of Herbert G. Colwell, a minor, sought by suit in a state court to set aside an unfavorable ruling of the Industrial Accident Board of Texas and to recover for the death of Amy L. Colwell, wife of plaintiff and mother of said minor, under the provisions of the Texas Workmen's Compensation Law. The suit was removed to the District Court of the United States, which, at the conclusion of plaintiff's testimony, directed a verdict for defendant, holding that the proof was insufficient to show: (1) that the accident was sustained in the course of deceased's employment, and (2) that the accident caused, or contributed to, her death.

Deceased was employed by the El Paso Natural Gas Company, whose offices were on the twelfth floor of the Bassett Tower. Employees were customarily allowed fifteen-minute rest periods twice daily, during which time they were permitted to

leave the building. On December 16, 1943, during the morning rest period, deceased entered the elevator with some of her co-employees. After entering the elevator she suddenly decided to return to her office to get her coat since she was going outside the building, and across the street, to a bank to cash a personal check. As she started to leave the elevator the doors began to close upon her. Apparently unhurt, she returned to her office, got her coat, went to the bank, and then returned to the drug store on the ground floor of the building where she had a drink with her companions. Later in the morning she complained of feeling ill and started home, but collapsed on the sidewalk before reaching the car which was to take her home. She was given prompt medical attention but died in a hospital a few hours later. An autopsy revealed that she died of a cerebral hemorrhage as the result of the rupture of a blood vessel in a brain tumor.

■ Article 8307, Sec. 5, of Vernon's Revised Annotated Civil Statutes of Texas, places the burden of proof on plaintiff affirmatively to show that the death of the employee arose from an injury originating in the work of the employer while the employee was engaged in or about the business of the employer.

The testimony is undisputed that although she was paid during these rest periods the deceased was on a personal mission at the time of the accident.

■ Even if it be conceded that deceased, during the permissive intermission, was in the course of her employment while she was on the elevator, nevertheless, the proof wholly fails to show that she sustained an injury which either contributed to, or caused, her death.

■ There is no proof as to the type of doors on the elevator, or the force with which they customarily closed or with which they might have struck deceased. It is a matter of common knowledge that elevators are not designed to be death traps and that many types would not cause injury even though they closed with full force against one's shoulder.

The testimony of the witnesses is so vague, uncertain and indefinite as to be insufficient to show that she received any injury, or trauma, whatsoever. The only witnesses as to the closing of the doors of the elevator on the deceased were her companions, Mrs. H. F. Greggerson, Jr., and Miss Mary Alice Himel.[1]

The testimony of these two ladies was all the testimony relating to any accident or injury. Mrs. Greggerson, when asked if Mrs. Colwell was caught between the two doors, answered: "Well, now, *I don't know* whether they did or not. I know

---

[1] Mrs. Greggerson gave the following testimony (Tr. 29, 30, 33):

"Q. What happened as she went to leave the elevator? A. Well, it happened so quickly, the first impression I had she was clinging to the right hand door.

"Q. Did the doors catch her between the two doors? A. Well, now, *I don't know whether they did or not.* I know that at the time she had *a slight hold on the right hand door.*

"Q. Did she make any expression at that time of excitement? A. Yes. *It was not much of one,* but she did say—there was an exclamation.

"Q. Then they re-opened the door, did they—A. Yes. It was not—

"Q. It was not entirely closed? A. *It was not entirely closed.*

"Q. What did Mrs. Colwell then do? A. She went on to her department and got her coat, and returned.

"Q. Did the elevator wait for her? A. Yes, sir.

"Q. And then it went on down? A. Yes.
* * * * * * * *
"Q. Did the doors come in contact with Mrs. Colwell, the door on both sides? A.

*I couldn't say whether they did or not, truly.*

"Q. You saw one of her hands? A. Yes, she seemed to be clinging to the right hand door going out." (Emphasis supplied.)

Miss Himel testified as follows (Tr. 34):

"Q. And what happened? A. Well, Mrs. Greggerson and Mrs. Roberts and myself were on the elevator, and Mrs. Colwell—we were all four on the elevator, and Mrs. Colwell was going to get off of the elevator to get her coat, as well as I saw it or could remember, and the girl started to close the door of the elevator as Mrs. Colwell started out, and it seemed to me that the left hand door *probably hit* her on the left side, *possibly* on the arm. *I don't know for sure.* That was about all I saw. (Emphasis supplied.)

"Q. Was she going back to get her coat? A. Yes, sir, she was going back to get her coat. We waited in the elevator there, and all went down together.

Q. Did you have refreshments that day on that trip? A. Yes, sir.

"Q. Where was it? A. In the Bassett Tower Drug Store."

that at the time *she had a slight hold* on the right hand door." When asked, "Did the doors come in contact with Mrs. Colwell, the door on both sides?" the answer was: *"I couldn't say whether they did or not, truly."* Miss Himel stated only that: "It *seemed* to me that the left hand door *probably* hit her on the left side, *possibly* on the arm. *I don't know for sure."* Both ladies testified that the elevator waited while Mrs. Colwell went to get her coat, that she went to the bank, and then came back and had a drink at the drug store. Neither of the witnesses is positive that anything happened in the elevator, other than that as Mrs. Colwell started out, the doors started to close and she put her right hand up against the elevator door. There is no testimony that she complained of being hurt or that she even mentioned the incident thereafter.

The witness, Jack Dunn, testified that Mrs. Colwell collapsed on the sidewalk some time later in the day as she started to get in his car.

The doctor who attended deceased and was present at the autopsy, as well as the one who performed the autopsy, testified that she died of a ruptured blood vessel in a tumor on the brain, and that such a result would have been apt to happen sooner or later without trauma of any kind; that the only external signs of injury were a small wound on her left leg below her knee, and a bruise on her right leg. There is a total absence of any testimony that she was struck on either leg by the doors of the elevator, and the only reasonable explanation of the bruises is that she received them when she collapsed on the sidewalk after leaving the building to go home.

That the cause of her death was the rupture of a blood vessel in a brain tumor, which rupture produced a cerebral hemorrhage, is undisputed. There were no bruises or signs of any trauma around her head and body but only on her legs below the knees. A doctor who did not attend the deceased, in answer to a hypothetical question, stated that "a *severe* mental trauma or a *severe* physical trauma would cause an excessive amount of blood to flow into the brain, therefore putting more stress upon the weakened vessels and causing a hemorrhage" and that the accident in the elevator "probably" contributed to the rupture of the blood vessel. We are of the opinion that the latter doctor's testimony is of no value because there is a total want of proof of any *severe* mental or physical trauma in the evidence.

Since the testimony is insufficient to show that any injury was sustained in the course of decedent's employment that could have caused, or contributed to, her death, it becomes unnecessary for us to decide whether or not the deceased was in the course of her employment at the time of the alleged accident in the elevator.

The judgment of the lower Court is affirmed.

McCORD, Circuit Judge (dissenting).

I cannot bring myself to concur in the majority opinion. Amy L. Colwell, the deceased, was injured in an elevator in the building where she was employed by the El Paso Natural Gas Company, and died on the same day she was injured. The custom had grown up in the business where she worked to allow all employees fifteen minutes both morning and afternoon in which to rest, and salaries were not deducted for such rest periods. The deceased with three other employees entered the elevator on the twelfth floor where they worked, and were in the act of descending to attend to some personal errands and to secure coffee. The deceased remembered that she had left her coat and just as she started to leave the elevator to return to her place of work for it, the elevator operator attempted to close the elevator doors and she was caught between them and was injured.

I quote all the evidence touching the accident and *injury upon which decision* should turn:

Mrs. Greggerson testified: "Q. Did you start down the elevator together that day? A. Yes.

"Q. Just state in your own way what took place—who was on the elevator, whether anybody went to get off, and the circumstances? A. We were all waiting for the elevator when I decided to go back and get my coat. The elevator came in the meantime and the other three girls were in it when I came back, and I entered the elevator, and at that time I believe Mrs. Colwell decided she wanted her coat.

"Q. Do you remember whether she stated she wanted her coat? A. Some expression, yes, that she used we knew it was her coat she was going for.

"Q. What happened as she went to leave the elevator? A. Well, it happened so quickly, the first impression I had she was *clinging* to the right hand door.

"Q. Did the doors catch her between the two doors? A. Well, now, I don't know whether they did or not. I know that at the time she had a *slight* hold on the right hand door.

"Q. Did she make any expression at that time of excitement? A. Yes. It was not much of one, but she did say—there was an exclamation.

"Q. Then they re-opened the door, did they? A. Yes. It was not—

"Q. It was not entirely closed? A. It was not entirely closed.

"Q. What did Mrs. Colwell then do? A. She went to her department to get her coat, and returned. * * *"

On cross examination:

"Q. Just as she went to leave the elevator the doors closed partially, is that right? A. She seemed to be leaving right at the same time they were closing. She went directly out, and we assumed it was to cash a check.

"Q. She came back to the lunch counter, or to the table in the Bassett Tower where you and Miss Himel were? A. She returned before I did. They were all together at the table when I returned.

"Q. You went out to cash a check? A. No, I went on an errand. * * *"

On redirect examination:

A. It was the day after pay day.

"Q. It was nothing unusual for the girls to go out and get their checks cashed was it? A. I believe not.

"Q. Did the doors come in contact with Mrs. Colwell, the door on both sides? A. I couldn't say whether they did or not, truly.

"Q. You saw one of her hands? A. Yes, she seemed to be *clinging* on the right hand door going out.

*     *     *     *     *

Miss Mary Alice Himel testified:

"Q. Do you remember the occasion of the last day she was at the office, about your going down the elevator? A. Yes, sir.

"Q. Who was with you? A. Mrs. Roberts and Mrs. Greggerson and Mrs. Colwell and myself.

"Q. Was there an accident or anything unusual happened there? A. Yes, as we were on the elevator.

"Q. And what happened? A. Well, Mrs. Greggerson and Mrs. Roberts and myself were on the elevator, and Mrs. Colwell—we were all four on the elevator, and Mrs. Colwell was going to get off of the elevator to get her coat, as well as I saw it or could remember, and the girl started to close the door of the elevator as Mrs. Colwell started out, it seemed to me that the left hand door probably hit her on the *left side, possibly on the arm.* I don't know for sure. That was about all I saw. She was going back to get her coat and the elevator waited. We waited in the elevator there and all went down together."

John Eichelmann testified that he was in charge of the department which was on the twelfth floor; that it was a custom for all the employees of the El Paso Natural Gas Company to take fifteen minutes off in the morning and afternoon for a rest period. "Q. What was the purpose of the rest period? A. Well, ordinarily, most of them would go downstairs for the purpose of having a cup of coffee, something to drink." The work was exacting. Mrs. Colwell was taken sick after the elevator accident and went home that morning.

Jack Dunn, an insurance man, stated that he saw Mrs. Colwell standing in front of the Bassett Tower building where she worked between 9:30 and 10 o'clock in the morning; that she was ill and he went for his car and carried her to where she could be treated; that just as he returned with his car Mrs. Colwell collapsed and he put her in the car and carried her to a place where the doctor came and treated her.

Three doctors testified. Dr. Cummins was called in and testified that Mrs. Colwell was in a semi-comatose condition and later became entirely unconscious; that she had a small wound on her left leg below the knee cap, and some bruises on her right leg; that she died that night. Dr. George Turner was called in after the death of Mrs. Colwell by Dr. Cummins and made a post-mortem examination of the body of the deceased. He had never known Mrs. Colwell in life. It was the opinion of both doctors that Mrs. Colwell died from a small tumor which was growing in the brain substance and which had been ruptured. Doctor Turner on cross-examination testified:

"Q. And I believe you say that the blood vessels had greatly increased in size, did you say that, or in number? A. In size and number. The tumor itself was just plexiform of coils and arrangement of blood vessels."

Dr. Cummins refused to say whether or not the accident which was described to him was a producing cause of the death. Dr. Turner testified that deceased might have a rupture of the tumor sooner or later without external violence.

Dr. Swope, a physician who had been practicing his profession for fifty-seven years and who was shown to be a specialist in psychiatry and neurology, was given a hypothetical question which covered every phase of the accident and the evidence of the two doctors covering minutely the autopsy performed and the condition of the brain and the tumor found. Moreover, he had been given and had read this question beforehand. He testified: " * * * Therefore a tumor of this class might remain in this position and have no effect whatever on a physical activity of a person or of their mental condition. This tumor—the size of this tumor is small, two centimeters and a half, would be about the length of the distal joint of the little finger. The tumor was still comparatively small and it had not pressed upon the vital tissues of the brain at that time sufficiently to alter their normal processes. What happened in this instance was a rupture of one of these small vessels, a small artery, which was a part of this tumor growth. * * * The reason I have an opinion is that I am conscious of the fact that with these thin vessels in this position that a *severe* mental trauma or a *severe* physical trauma would cause an excessive amount of blood to flow into the brain, therefore putting more stress upon the weakened vessels and causing a hemorrhage.

"Q. Now, is it your opinion then that this accident at the elevator contributed to the rupture of the blood vessel? A. I would say that it is my opinion that it probably did."

It is without dispute that Mrs. Colwell was thirty-one years of age and healthy at the time of the accident.

While each case must stand upon its own bottom, the Texas courts and this court have many times held that compensation should be paid where one is injured going to and from work, or moving about the premises where work is being performed. Casualty Reciprocal Exchange v. Johnson, 5 Cir., 148 F.2d 228; Security Mutual Casualty Co. v. Wakefield, 5 Cir., 108 F.2d 273; Fidelity & Casualty Co. of New York v. Mitchell, 5 Cir., 134 F.2d 537; Winder v. Consolidated Underwriters, 5 Cir., 107 F.2d 973.

My brothers have completely lost sight of the Texas Workmen's Compensation Law wherein courts are commanded to *liberally construe* such law. Here it is being technically construed.

The court seems to have completely forgotten that a jury had been impaneled and was present to try the fact issue, as the court constituted itself a fact-finding instrument and completely ignored the jury, although the evidence was sufficient to carry the issue to the jury. Theago v. Royal Indemnity Co., Tex.Civ.App., 70 S.W.2d 473; Southern Underwriters v. Hoopes, Tex.Civ.App., 120 S.W.2d 924; Brodtmann v. Zurich General Accident & Liability Ins. Co., 5 Cir., 90 F.2d 1; Federal Underwriters Exchange v. Polson, Tex.Civ.App., 148 S.W.2d 956.

The purpose of these laws, of which the Texas Workmen's Compensation Law is one of the best, is to in some sort prevent the many petty and grievous damage suits that constantly arise and vex both employer and employee, and to fix a just and equitable compensation for employees where they have been injured.

The evidence shows, I submit, a jury question, but the trial court banished the jury, swept equity under the bed, and forgot to remember to liberally construe the law. Such technical construction by the courts will finally whittle away the usefulness of these compensation laws and they will become of no effect.